# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 00 C 2302 | DATE | 12/14/2000 |
| CASE TITLE | David G. Zolek vs. Kenneth S. Apfel, etc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons set out in this opinion, this Court remands Zolek's case so that a vocational expert may testify as to whether Zolek can perform other jobs in the national economy and so that a decision as to his disability may be rendered in that light. And just as our Court of Appeals did in Sarchet, 79 F3d at 309, this Court urges Commissioner to transfer the case to a different ALJ on remand.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | DEC 14 2000 | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | 12/14/2000 | |
| SN | courtroom deputy's initials | FILED FOR DOCKETING 00 DEC 14 PM 2:39 | date mailed notice SN mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DAVID G. ZOLEK )
SS# 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, )
 )
    Plaintiff, )
 )
v. ) No. 00 C 2302
 )
KENNETH S. APFEL, etc., )
 )
    Defendant. )

MEMORANDUM OPINION AND ORDER

David Zolek ("Zolek") appeals the final decision of Commissioner of Social Security Kenneth Apfel ("Commissioner") that denied Zolek's application for disability insurance benefits under Social Security Act §§ 216(i) and 223, 42 U.S.C. §§416(i) and 423.[1] Zolek seeks a remand on grounds that Administrative Law Judge ("ALJ") Levert Bassett failed adequately to assess significant evidence in the record and relied improperly upon the Medical Vocational Guidelines (the "Grid") to direct a decision that Zolek was not disabled. For the reasons set out in this opinion, this Court remands Zolek's case so that a vocational expert may testify as to whether Zolek can perform other jobs in the national economy and so that a decision as to his disability may be rendered in that light.

---

[1] All further statutory references will take the form "Section --," using the Title 42 numbering rather than the Act's internal numbering. All portions of 20 C.F.R. will be cited "Reg. § --." Finally, all citations to Social Security Rulings will take the form "SSR --."

## Procedural Background[2]

On December 30, 1994 Zolek filed an application for disability insurance benefits, asserting that he had become disabled on December 18, 1993 due to "memory difficulty" (R. 24). That application was denied both initially and upon reconsideration (R. 28-37, 43-55). Zolek then requested and received a hearing on June 12, 1997 before ALJ Bassett (R. 223).

On June 4, 1998 the ALJ issued an opinion denying Zolek's request for disability benefits (R. 11-20). ALJ Bassett found that although Zolek was incapable of performing his past relevant work, he was able to perform a significant number of other jobs in the national economy, so that he was not disabled (R. 19-20). ALJ Bassett's decision became final when the Appeals Council denied Zolek's request for further review (R. 5-6). Thereafter Zolek filed this action pursuant to Section 405(g).

## Zolek's Impairment

Zolek's impairment-related health problems began in October 1988, when he suffered an intracerebral hemorrhage (R. 92). On October 13 Zolek underwent a computerized tomography (CT) scan, which revealed a large intracerebral hematoma (R. 163). Zolek was then hospitalized for a period of ten days, being discharged on October 23 (R. 163).

---

[2] What follows in the next sections of the text is drawn from the administrative record (cited "R.--").

2

Shortly thereafter Zolek returned to his job as a Senior Loss Control Representative at Kemper Insurance Company ("Kemper")(R. 238, 252). That position, which Zolek had held since 1975, required him to inspect boilers and other machinery and then write reports about the inspections (R. 64, 238). Zolek testified that after he returned to work he had memory problems that made it difficult for him to perform his work, problems that became progressively worse as his job became more complicated (R. 236). Zolek remained at Kemper until December 18, 1993, when Kemper put him on medical leave (R. 228).

<u>Medical Evidence as to Zolek's Impairment</u>

After being placed on medical leave, Zolek visited several medical professionals who diagnosed his condition. Zolek was first examined on December 23, 1993 by Steven Meyers, M.D., who concluded that Zolek had mild to moderate cognitive and perceptual difficulties that would prevent him from performing his job as a Senior Loss Control Representative (R. 124). Dr. Meyers referred Zolek to Joshua Barras, Ph.D., a neuropsychological evaluator (R. 172).

Dr. Barras examined Zolek in early February 1994 (R. 172). In his February 14 written evaluation Dr. Barras said that Zolek exhibited a selective pattern of mild to moderate cognitive disabilities consistent with posterior cerebral involvement (R. 174). Dr. Barras also noted that although Zolek's language and

3

simple verbal reasoning abilities were well preserved, he had a mild impairment of memory as well as deficits of visual detail, visual analysis and perception, and visual-motor integration and speed (R. 179). Dr. Barras went on to conclude that Zolek would not be able to perform his past job, but opined that he was employable in other positions (R. 175):

> Given the complexity of this patient's work, it is likely that the deficits described above will continue to disrupt his performance and may compromise his safety on the job. However, he is certainly still employable in a less demanding role and he may benefit from vocational rehabilitation to assist in finding an appropriate position.

After having been examined by Drs. Meyers and Barras, on July 14, 1994 Zolek was admitted to Meadowbrook of Chicago, a rehabilitation center for persons with head injuries (R. 164). Zolek was initially admitted for the purpose of undergoing a five-day comprehensive evaluation that would include physical, cognitive psychological, vocational status and medical status relative to his functional capabilities for home, community and vocational functioning (R. 164). Zolek underwent that evaluation, the results of which are contained in Meadowbrook's "Initial Report" prepared by Meadowbrook Medical Director Norton Flanagan and Program Case Manager Sharon Babat (R. 163-68).

Most significant among the Meadowbrook evaluations was that performed by neuropsychologist Michael Gelbort, Ph.D. Although the "Initial Report" contains some discussion of Dr. Gelbort's

findings (R. 164), they are set forth in considerably greater detail in Dr. Gelbort's own July 27, 1994 memorandum (R. 176-77). There he indicated that his clinical assessment findings were essentially similar to those of the formal testing earlier performed by Dr. Barras (R. 176). Dr. Gelbort noted particularly that Zolek had deficits in areas of learning, memory and higher cognitive or executive functions (id.). Dr. Gelbort then went on to say in relevant part (R. 176):

> The memory dysfunction has practical implications for his job performance in that he is anticipated to have trouble reliably encoding or "learning" new information at an appropriate rate of speed; translated into terms relating to job behavior, it is suspected that he will not remember all that he is asked to do on various assignments unless he is meticulous in writing things down. Mr. Zolek is likely to have trouble doing this as the part of cognition which "oversees" or "supervises" his behavior, namely the executive functions, are also showing signs of impairment. This is to say that he demonstrates impairment in the capacity to monitor his own thought processes and to check and see if he is conforming to current and ongoing task demands. While people with normal executive functions intuitively make themselves aware when they are not doing what is asked of them, as well as what their supervisor and the job want in order to accomplish the objective of the work, Mr. Zolek is likely to overlook or "forget" to do parts of his job and will have difficulty making himself aware of what else needs to be done to satisfy the needs of the job and those for whom he is working.
>
> It is likely that he may appear oppositional, passive aggressive, or concrete when he fails to meet supervisor's expectations. He is probably not intending to be difficult but lacks the cognitive powers to accurately assess the effect his behaviors and cognitive deficits have on others and to correct his cognitive deficits.

There were some other noteworthy results reported in Zolek's Initial Evaluation:

5

1. According to his Occupational Therapy evaluation (R. 165-66), Zolek exhibited mild deficits for complex problem-solving and an impaired awareness of his disability, though he also demonstrated intact functioning for simple and complex activities of daily living skills. Finally, Zolek displayed intact physical functioning and adequate endurance.

2. Zolek's Speech and Language Pathology evaluation (R. 166) indicated mild to moderate deficits with written expression, and mild cognitive impairment. Zolek's auditory comprehension, reading comprehension, oral expression, intelligibility, swallowing functioning and pragmatics were intact. But Zolek showed decreased complex problem-solving skills, verbal memory, confidence and error correction, along with increased processing time. He made numerous errors of various types when writing, and he exhibited decreased attention and concentration. Zolek's writing accuracy was between 75% to 90%, his immediate memory was at the 75% accuracy level and his delayed memory for three objects was at 66%.

On the basis of the five-day evaluation at Meadowbrook, the treatment team recommended that Zolek participate in outpatient vocational therapy there (R. 167). Accordingly Zolek received such therapy at Meadowbrook over the ensuing six-month period,

6

and he was discharged from vocational rehabilitation on January 17, 1995 (R. 127). By the end of Zolek's rehabilitation the Meadowbrook treatment team had concluded that Zolek was incapable of returning to his job at Kemper, but it reached no conclusions about his ability to return to other work (R. 130-31). Indeed, Zolek was supposed to meet with a vocational specialist and undergo testing that would help the Meadowbrook team provide a plan reporting on his "vocational strengths and assets" (id.). There is, however, no indication in the record that any such meeting ever occurred.

After Zolek was discharged from Meadowbrook, Kwang Kim, M.D. performed a psychiatric evaluation on February 22, 1995 (R. 178). Dr. Kim diagnosed Zolek as having mild dementia secondary to a brain aneurysm (R. 180). En route to that diagnosis Dr. Kim found no evidence of thought disorders, hallucinations or delusions, adding that Zolek had some mild but not significant anxiety (R. 179). On memory testing, Zolek was able to repeat seven digits forward and five digits backward, and he memorized one out of three subjects after five minutes (id.). He was able to perform simple calculations (though he committed several errors in calculating serial 7's), was able to describe simple similarities and differences and had adequate judgment and abstraction (id.). Though Dr. Kim believed that Zolek was competent to handle his own funds, Dr. Kim added that "it would

7

be safe if someone can supervise him" (R. 180).

Zolek has not taken medication for his mental impairment at any point (R. 74). Additionally, aside from the vocational therapy at Meadowbrook and the above-described diagnoses, Zolek has had no other medical treatment for his condition.

## Zolek's Hearing Testimony

Before ALJ Bassett, Zolek provided testimony regarding how his mental impairment affects his ability to work. When asked by the ALJ whether he could perform a job as a clerk, telephone solicitor or cashier, Zolek testified that he might have problems with his memory (R. 242). Zolek said that on a short-term basis he often forgot word meanings (id.). In addition, he had memory lapses that would cause him to forget instructions given to him (R. 243). Zolek stated those problems forced him to make lists at home (id.).

Zolek also provided testimony about his daily non-working activities. He testified that he rented a car on a one-day basis every three or four months to do errands like going to the bank or post office (or coming to the ALJ hearing) (R. 243-44). Zolek used a small off-the-shelf personal computer to balance his checking account, follow the market on his mutual funds, plan vacations and play games (R. 247-48, 250-51). Zolek made decisions about his rare mutual fund purchases by reading the newspaper and a mutual fund publication for which he had a

subscription (R. 249-50). Zolek played golf once a week, and he used a computer spread sheet that he prepared (something that he described as easily prepared by following the instructions) to choose among some 40 golf courses to provide variety (R. 251). Zolek's condition did not appear to have affected his ability to play golf (R. 257).

Finally, Zolek described the anxiety that he experienced in dealing with unfamiliar surroundings or situations (R. 257-58), as well as his difficulties with verbal (really oral) communication (R. 258). And he concluded by returning to his problems with lapses of memory ("Like I walk into a room and forget why I'm there") (id.).

## Statutory and Regulatory Framework

Zolek must suffer from a disability to be eligible for his claim for benefits. "Disability" is defined in pertinent part as the inability (Section 423(d)(1)(A)):

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995) (citations omitted) sets out the customary five-step inquiry prescribed by Reg. §404.1520 to determine whether a claimant is disabled:

(1) whether a claimant is currently employed;
(2) whether the claimant has a severe impairment;

9

(3) whether the claimant's impairment meets or equals one of the impairments listed by the SSA, see 20 C.F.R. § 404, Subpt. P, App. 1;
(4) whether the claimant can perform her past work; and
(5) whether the claimant is capable of performing work in the national economy.

If a claimant satisfies steps one, two, and three, she will automatically be found disabled. If a claimant satisfies steps one and two, but not three, then she must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy.

If a disability determination reaches step five, the ALJ must discharge the stated burden of proof either by applying the Grid or through the use of a vocational expert (Herron v. Shalala, 19 F.3d 329, 336-37 (7th Cir. 1994)). As for the first alternative, the Grid reflects an analysis of the vocational factors of age, education and work experience (Reg §§404.1563 to .1565) in combination with the claimant's residual functional capacity ("RFC").

In turn, RFC is defined by SSR 83-10 as (Marcus v. Sullivan, 926 F.2d 604, 608 (7th Cir. 1991)):

> [a] medical assessment of what an individual can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of his or her medically determinable impairment(s).

That assessment is expressed in terms of a claimant's maximum sustained work capability for either "sedentary," "light," "medium," "heavy" or "very heavy" work as defined in Reg. §404.1567. Where an ALJ's findings of fact as to the vocational

factors and RFC coincide with all the criteria of a particular Grid rule, the rule directs a conclusion of "disabled" or "not disabled." And because the Grid takes into account the number of unskilled jobs in the national economy at the various functional levels (Reg. §404.1566), the existence of such jobs is established when the findings of fact coincide with the criteria of a rule (Reg. App. §200.00(b)).

But importantly for the present case, nonexertional limitations (such as mental impairments) are not reflected in Grid determinations. Hence Reg. App. §200.00(e)(1) says:

> In the evaluation of disability where the individual has solely a nonexertional type of impairment, determination as to whether disability exists shall be based on the principles in the appropriate sections of the regulations, giving consideration to the rules for specific case situations in this appendix 2. The rules do not direct factual conclusions of disabled or not disabled for individuals with solely nonexertional types of impairments.

Notwithstanding that regulation, our Court of Appeals has on occasion held that an ALJ may use the Grid to direct disability determinations involving nonexertional impairments so long as that limitation has no significant impact on a claimant's capacity to perform the range of work the individual is otherwise exertionally capable of performing (see, e.g., Pugh v. Bowen, 870 F.2d 1271, 1277 n.6 (7th Cir. 1989) and cases cited there).

### Standards of Review

Estok v. Apfel, 152 F.3d 636, 638 (7th Cir. 1998) is one of

11

many cases that teach judicial review of an ALJ's factual determinations is limited to whether they were supported by substantial evidence in the record, typically quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) as to that standard:

> "Substantial evidence" has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

And while this Court reviews the whole administrative record, it "does not substitute its judgment of the Commissioner [or ALJ] by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility" (<u>Estok</u>, 152 F.3d at 638).

Nonetheless a court "cannot uphold a decision by an administrative agency...if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result" (<u>Sarchet v. Chater</u>, 78 F.3d 305, 307 (7th Cir. 1996)). Finally, in contrast to the "substantial evidence" standard applicable to factual determinations, the ALJ's legal conclusions are reviewed de novo (see, e.g., <u>Dotson v. Shalala</u>, 1 F.3d 571, 575 (7th Cir. 1993)).

### ALJ Bassett's Decision

Here ALJ Bassett found at step five of the disability

determination that Zolek was not disabled (R. 18).³ In reaching that result, ALJ Bassett did not consult a vocational expert to determine whether Zolek was capable of performing other jobs in the national economy, holding instead that "Vocational Rule 203.29 [the Grid] and [SSR] 85-15 directs [sic] a conclusion of not disabled" (R. 18). Although ALJ Bassett did not specify the precise manner in which he believed SSR 85-15 directed such a conclusion, before this Court Commissioner highlights the portion of that SSR that reads:⁴

> Where a person's only impairment is mental, is not of listings severity, but does prevent the person from meeting the mental demands of past relevant work and prevents the transferability of acquired work skills, the final consideration is whether the person can be expected to perform unskilled work.

It is evident that on the basis of the evidence before him, ALJ Bassett concluded that Zolek was capable of performing unskilled work,⁵ but as explained hereafter it is equally evident

---

³ Although Commissioner Mem. 10 suggests that ALJ Bassett made the disability determination at step four, it is evident from the ALJ's opinion (and from this Court's just-completed discussion of the operative legal standards) that the determination was made at step five.

⁴ Because all 1985-issued SSRs have been compiled in Social Security Rulings (cumulative ed. 1995), citations to SSR 85-15 in this opinion will also include page references to that compilation. What follows in the text appears at page 94.

⁵ SSR 85-15 at 94 goes on to say:

> The basic demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple

13

that he did so in a bootstrap fashion. Then, after making that determination, he applied the Grid to direct his decision. Zolek has taken exception to that process, contending that the ALJ should instead have been required to obtain and hear testimony from a vocational expert to make findings about Zolek's ability to perform other jobs in the national economy. This opinion now turns to a resolution of that issue.

## Use of the Grid

What is almost immediately clear from ALJ Bassett's opinion is that he applied an unorthodox methodology in his step five determination. In applying both SSR 85-15 and the Grid, ALJ Bassett ignored the admonition of SSR 85-15 that "where a person has solely a nonexertional impairment(s), the [Grid] rules do not direct conclusions of disabled or not disabled." It will be recalled that SSR 85-15 at 94 defines as the "final considera- tion" for a claimant of Zolek's profile the decision as to whether he can perform "unskilled work"--and the just-quoted

---

> instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work related activities would severely limit the potential occupational base.

ALJ Bassett's opinion recited those factors in concluding that Zolek was capable of performing unskilled work (R. 18), but in so doing the ALJ ignored entirely--he made no effort at all to reconcile or to explain away--the multiple deficits identified in the Meadowbrook evaluation and therapy that plainly impacted adversely on a number of the factors.

portion of the SSR does not contemplate use of the Grid in such an instance.

Any other reading of SSR 85-15's teaching would be circular, because once it has been concluded that a claimant can perform unskilled work, the application of the Grid becomes superfluous. After all, the Grid itself is brought into play only to determine whether there are jobs in the national economy that a claimant can perform. Any earlier-reached conclusion that the claimant can indeed perform unskilled work obviates any need to consult the Grid.

In terms of the ALJ's conclusory view that Zolek can perform unskilled work, the reader is relatedly reminded of the courts' constant admonition to ALJs that they must not attempt to play doctor (see, e.g., Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir. 2000) and cases cited there). Those admonitions make the obvious distinction between the ALJ making a lay decision as to an inherently professional judgment (which is impermissible) and his or her choosing between competing professional judgments for cogently-expressed reasons (which is permissible). Just so with an ALJ's amateur resolution of a question that calls for the professional evaluation of a vocational expert--that is akin to (though not of course precisely parallel to) the conduct that prompted our Court of Appeals' criticism in Sarchet v. Chater, 78 F.3d 305, 308 (7th Cir. 1996):

15

The administrative law judge made a number of unfounded sociological speculations which bespeak a lack of imagination concerning the lives of many of the people who apply for social security disability benefits.

In this instance the principal vice of the ALJ's lack of a real-world approach lay in his uncritical acceptance of a single sentence in Dr. Barras' initial evaluation of Zolek, without giving heed to what was revealed in the ensuing intensive evaluation at Meadowbrook. Those revelations obviously seem to bear not just on Zolek's inability to handle his former job but also on his potential for functioning in *any* employment environment (look again, for example, at the extended quotation from Dr. Gelbort's findings earlier in this opinion). That sort of performance by an ALJ, who is certainly a nonprofessional in this area of predictability, is precisely why Commissioner's own SSR 85-15 circumscribes the ALJ's role in the nonexertional field of mental impairments to "relatively simple issues," going on to say (referring specifically to vocational experts):

> In more complex cases, a person or persons with specialized knowledge would be helpful.

To recapitulate, what ALJ Bassett did was to stress (R. 15-16) Dr. Barras' initially stated belief (R. 175) that Zolek "is certainly still employable in a less demanding role"--a statement that antedated and did not have the benefit of the ensuing in-depth evaluation at Meadowbrook. ALJ Bassett went on to emphasize elements of Zolek's functioning in the nonstressful

16

nonwork environment, again ignoring the numerous deficits revealed by in-depth evaluation that not only confirmed Zolek's inability to return to his prior job but also carried the obvious potential for impairing his ability to carry any job (even one demanding lesser skills). And yet the ALJ's amateur diagnosis made no effort to explain why the deficits revealed by that evaluation would not be expected to carry over into unskilled work as well.

That lack of a reasoned explanation does violence to still another principle fundamental to Commissioner's disability decisions and their subsequent judicial review. As <u>Nelson v. Apfel</u>, 131 F.3d 1228, 1237 (7th Cir. 1997)(citations and internal quotation marks omitted)--one of many cases so holding--has put it:

> The Secretary's decision must be based on consideration of all relevant evidence and the reason for his conclusion must be stated in a manner sufficient to permit an informed review. Furthermore, the Secretary may not select only that evidence that favors the ultimate conclusion, but rather must articulate at some minimum level his analysis of the evidence in cases in which considerable evidence is presented to counter the agency's position.

This Court will not fall into the same vice as the ALJ: It will not attempt to arrive its own conclusion from a record that calls out for consideration by an expert and not an amateur diagnostician. Instead it holds that the ALJ erred in failing to call upon a vocational expert under the circumstances of this

case. It must be remembered that it is Commissioner and not Zolek who bears the burden at step five of showing that Zolek can perform other jobs in the national economy[6] (Knight, 55 F.3d at 313). And that burden has not been met here.

### Conclusion

Zolek's case is remanded so that the opinion of a vocational expert may be obtained on the subject of whether Zolek is capable of performing unskilled work, and so that a proper evaluation may be made by an ALJ with that opinion taken into account. And just as our Court of Appeals did in Sarchet, 79 F.3d at 309, this Court urges Commissioner to transfer the case to a different ALJ on remand (see also Clifford, 227 F.3d at 874).

_____
Milton I. Shadur
Senior United States District Judge

Date: December 14, 2000

---

[6] Thus the statements in Commissioner's Mem. 12 that "Plaintiff has the burden of producing evidence of a disabling mental impairment" and that "He has failed to meet that burden" are misleading in the present context. Although it is true that a claimant has the burden of proof through stage four of the disability determination, the disability determination here was made at step five.